### CONKLIN, et ux v. CARRIAGE HILL LIMITED PARTNERSHIP, et al.

No. 74-342-CA(L)01-B.

Circuit Court, Palm Beach County.

November 7, 1978.

Arthur C. Koski, Boca Raton, for the plaintiffs.

Robert S. Levy, West Palm Beach, for the receiver for the defendant Carriage Hill Limited Partnership.

DANIEL T. K. HURLEY, Circuit Judge.

*Final judgment:* This case presents the question of whether newly constructed seawalls, built and sold as part of residential subdivision lots by a builder-developer, enjoy the protection of an implied warranty of fitness? For the reasons set forth herein, the question is answered in the affirmative.

This action consists of five cases which were consolidated for trial. In addition to the main actions, there are third party claims, cross-claims and counter-claims. The status of the parties and their respective claims are discussed below. From the testimony and evidence presented at trial, the court makes the following —

*Findings of fact*

[substantial portions are omitted]

15) On January 14, 1974 there were unusually heavy rainstorms in the Boca Raton area. Some of the Carriage Hill lots had not been filled to grade and consequently the rain ran off into the below grade lots rather than into the storm drain. The intensified pressure behind the seawalls resulted in a dynamic collapse of the seawalls when the anchor tie-backs which had been improperly linked, pulled out of the concrete cap. From the expert testimony at trial, the court finds as a matter of fact that the seawall failure would not have occurred had the engineering design been adhered to by threading the tie-backs through the lifting eyes, by placing stirrups in the cap, and by providing sufficiently enlarged weep holes. With the possible exception of the weep holes, it should be noted that none of these conditions was visible to the ultimate purchaser at the time of purchase. The area of the cap where the tie-

rod would have interconnected with the lifting bar and where the stirrup would have been placed, was fully encased in cement.

16) As a result of the negligent construction, two hundred and fifty feet of continuous seawall at Carriage Hill failed during the January 14th rainstorm. Each plaintiff suffered the following damage — [Conklin (1 lot), $3,200; Titus and Lunsford (2 lots), $5,400; Florida Vantage Properties (1 lot), $4,802; Fargo Long (4 lots), $3,185.]

## Conclusions of law
### I. Implied warranty

This case seems to be almost at mid-point between one well defined and a second less precisely drawn legal proposition. The first, part of a long-standing tradition, is that there are no implied warranties in the sale of *unimproved* realty. The second is that there are some situations involving improved realty and superior knowledge by sellers where the courts will extend implied warranties to at least first or immediate purchasers. This second proposition has only recently begun to emerge and consequently its boundaries are not firmly set. It is a court formulated remedy to achieve justice in light of modern economic and technological advances. Yet, because it represents a significant departure from the past, courts have cautiously limited its initial applications to first purchasers of new homes. At the same time, however, they have expressed the view that this concept is in its seminal stage and that its growth will depend on a case-by-case analysis. *Yepsen v. Burgess*, 525 P.2d 1019, 1022 (Ore. Sup. Ct. 1974); *Tavares v. Horstman*, 542 P.2d 1275, 1282 (Wyo. Sup. Ct. 1975) ("We do not exclude the possibility that industrial property and vacant land in a proper setting may be embraced . . .")

Two recent Florida cases which illustrate the present state of the law and which heighten the distinction between these concepts are *Schmitt v. Long*, 290 So.2d 139 (Fla. 4th DCA 1974), and *Gable v. Silver*, 258 So.2d 11 (Fla. 4th DCA 1972), aff'd. 264 So.2d 418 (Fla. 1972). *Schmitt* involved a situation where a seller (Schmitt) filled two lots and then sold them to the purchaser (Long). Two years later Long began to construct a home and discovered that the soil was inadequate. It required extensive demucking and compacting before it would support a house foundation. He sued Schmitt and raised the issue of implied warranty of fitness. The appellate court rejected this contention citing the general rule of no implied warranties in the sale of unimproved land. [For an analysis of the rationale underlying this rule and for an excellent discussion as to why the alteration of this rule is best left to the legislature, see *Cook v. Salishan Properties, Inc.*, 569 P.2d 1033 (Ore. Sup. Ct. 1977).] *Gable,* on the other hand, dealt with

improved realty. There purchasers of new condominium apartments sued a builder-developer (Gable) because of a malfunctioning air conditioning system. The court determined that the system was part of the realty and that it was covered by an implied warranty of fitness and merchantability. In contrasting the holdings in *Schmitt* and *Gable* and in defining the limits of *Gable*, the *Schmitt* panel (which included the author of *Gable*), said —

> "That case [Gable] dealt with first purchasers of condominium homes. It did not involve the sale of unimproved lands and has no bearing thereon."

The question then is where does this case fall? Admittedly it is without *Gable's* announced scope, but is it within its tacit protective range? To obtain an answer it is helpful to reconsider those principles which gave birth to *Gable*. The basic and underlying principle of *Gable* is a recognition that in some situations the rigid common law maxim of caveat emptor is inequitable. In relaxing this rule, the District Court of Appeal joined the developing trend in the United States which recognized that there ought to be an implicit understanding of the parties when an agreed price is paid that the home is reasonably fit for the purpose for which it is to be used. As said in *Humber v. Morton*, 426 S.W. 2d 554, 562 (Tex. 1968) —

> "The caveat emptor rule as applied to new houses is an anachronism patently out of harmony with modern home buying practices. It does a disservice not only to the ordinary prudent purchaser, but to the industry itself by lending encouragement to the unscrupulous, fly-by-night operator and purveyor of shoddy work."

While *Gable* and many of the early cases dealt with defects inside the structure, later cases followed the logical and necessary progression outside the walls of the building. In *Lyon v. Ward*, 221 S. E. 2d 727, 729 (N.C. App. 1976), the court reasoned that "because an adequate supply of useable water is an absolute essential utility to a dwelling house . . . ," the well which was constructed on the premises and sold as an integral part of the home was covered by an implied warranty of fitness. Similar results were reached in *Krol v. York Terrace Building, Inc.*, 370 A.2d 589 (Md. Sp. Ct. App. 1977) (well ran dry), and *Jeanguneat v. Jackie Hames Const. Co.*, 576 P.2d 761 (Okla. Sup. Ct. 1978) (unusable well water).

A number of cases have found malfunctioning septic tanks and drain field systems to be covered by implied warranties. *Coney v. Stewart*, 562 S.W.2d 619 (Ark. Sup. Ct. 1978); *Tavares v. Horstman*, supra; *Rutledge v. Dodenhoff*, 175 S.E.2d 792 (S.C. Sup. Ct. 1970). In *Yepsen v. Burgess*, supra, at 1023, the court noted that—

"Although these defects do not constitute inadequate workmanship in the construction of the dwelling structure itself, they are the product of the builder's work upon the land in conjunction with the construction and sale of the structure."

Irrespective of the location of the defect, the foregoing cases stand for the proposition that to apply the rule of caveat emptor to an inexperienced buyer and in favor of a builder who is daily engaged in the business of building and selling homes, is manifestly unjust. In today's real estate market, the buyer relies on the skill of the builder-seller and this is rightly so. As the court noted in *Conyers v. Molloy*, 364 N.E. 2d 986,988 (Ill. 4th App. 1977) —

"Like the buyer of an automobile, the purchaser of the house generally has neither the bargaining power to insist on a warranty nor the expertise to detect what could be wrong. Finally, but certainly not least, it seems only fair to put the burden of repairing the defects in construction on the person who is (1) responsible for the defects, (2) is in a position to repair them and (3) is in a position to spread the costs of the repair. This is especially true since a significant amount of the defects can be so buried in the construction that it could be impossible to find them before buying, no matter how careful or thorough the inspection."

Returning now to the facts of this case, we find negligently constructed seawalls by a builder-developer. The defects were fully hidden, encased in cement and incapable of discovery without costly inspection and repair. Moreover, the context of these transactions was the sale of residential subdivision lots within a municipality. In other words, the ultimate use of the lots was for residential buildings. The waterfront location of the lots and the in-place seawalls were prime inducemens for the sales.

Unquestionably, if defects of this severity existed within the walls of a structure above the ground, be it a home or a commercial building, there would be little discussion as to the existence of implied warranties. Though the court is concerned lest there be an undue extension of a limited concept, it cannot reasonably differentiate between the potential uses of the structure (residence, commercial building or seawall) nor attach critical importance to its location (i.e., whether it abuts or rests atop the land.). If, however, a later court should determine that implied warranty protection must be limited to homes, then, as indicated by the "well and septic tank cases" cited above, the focus is not limited to the residence alone, but extends to those other products of the builder's work upon the land which are reasonably related to the building of the home. Given the size and locations of the lots in this case, one could cer-

tainly find that the seawalls were necessary and essential elements for the building of homes. Thus, on either of these parallel theories, viz., that they are structures abutting the land or that they are products of the builder which are reasonably related to the building of a home, the court concludes that the seawalls are covered by an implied warranty of fitness, which in this instance, was breached by the builder-developer.

One remaining question is whether the warranty is limited to the first contract holder or whether it extends to the first purchaser who took by deed. In short, defendant Carriage Hill Limited Partnership has argued that there must be privity before there can be an extension of an implied warranty. This is incorrect. As stated by the court in *David v. B & J Holding Corp.*, 349 So.2d 676 (Fla. 3d DCA 1977) —

> "An implied warranty arises by operation of law and exists regardless of any intention of the vendor to create it; such warranty springs from the vendor's breach of some duty which amounts to taking advantage of the purchaser by reason of some superior knowledge in the vendor or the reliance by the purchaser on the vendor's representation or judgment."

Warranties implied by law are for the protection of the ultimate consumer. A strict application of the privity doctrine is antithetical to the public policy giving rise to implied warranties. In short, the test is reasonableness; not privity. See e.g., *Barnes v. Mac Brown and Co., Inc.*, 342 N.E. 2d 611 (Ind. Sup. Ct. 1976) (extension of warranty to second purchasers).

In summary, the plaintiffs have established the existence of an implied warranty, the breach thereof, money damages, and their entitlement thereto.